# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 46998-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ROBERT EUGENE FORD, | |
| Appellant. | |

MAXA, J. – Robert Ford appeals his convictions for second degree robbery and first degree malicious mischief. He also appeals the trial court's imposition of a discretionary legal financial obligation (LFO).

We hold that (1) the trial court did not violate Ford's right to the presumption of innocence when it ruled that he could not use a laser pointer or pencil to reference an exhibit, (2) the prosecutor's comments during closing argument did not constitute prosecutorial misconduct, (3) sufficient evidence was presented for the jury to find Ford guilty of first degree malicious mischief because the perpetrator's knowledge that his actions would cause damage in excess of $5,000 is not an element of the crime, (4) Ford's ineffective assistance of counsel claim based on defense counsel's proposal of a reasonable doubt instruction that differed from 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01, at 27 (3d ed. Supp. 2014-15) (WPIC) fails because he cannot show prejudice, (5) the record is insufficient to address Ford's ineffective assistance of counsel claim regarding his defense counsel's failure to object to the

inclusion of Ford's 1987 Florida burglary conviction in his offender score, (6) the trial court did not exceed its sentencing authority in imposing $33,727 in restitution because the trial court could impose double the victim's loss regardless of Ford's gain, and (7) the trial court erred when it imposed a discretionary LFO without making an individualized inquiry into Ford's ability to pay.

Accordingly, we affirm Ford's convictions and sentence, with the exception of the discretionary LFO. We remand for the trial court to make an individualized inquiry into Ford's present and future ability to pay the discretionary LFO.

## FACTS

*Background*

On November 22, 2012, Ford pried open and removed the coins from several machines at a laundromat owned by Joan Searls. Searls observed from the video monitor in her adjoining home that Ford was attempting to break open one of the dryer coin boxes with a crowbar. She went into the laundromat to confront him.

Ford started to leave and Searls blocked his path. Searls testified that as Ford passed her he put his hand out and knocked her off balance. Ford denied intentionally pushing Searls. Searls fell, bruising her arm and skinning her knee.

The State charged Ford with first degree robbery and first degree malicious mischief.

*Damage to Machines*

At trial, the parties presented conflicting testimony regarding the type and number of machines that Ford had damaged. Searls testified that Ford had attempted to pry into, and therefore damaged, 27 or 28 coin boxes of the total 30 washers and dryers as well as the soap

vending machine's coin box. Ford testified that he only broke into the coin boxes of the soap vending machine and three dryers. He denied attempting to pry open any of the washing machines.

Officer Joshua Miller, the responding officer, initially testified that he observed seven damaged dryers and the damaged soap vending machine. Miller later clarified that he also had observed three washers with missing coin boxes.

Searls's laundromat was shut down for nearly three months to fix and replace the damaged machines. Searls estimated that the total amount to repair the machines and the resulting damage was $25,000.

Harry Osborn, an insurance adjustor, testified about Searls's insurance claim. Searls sent Osborn pictures of the laundromat's damage a few days after the incident. Osborn later took pictures of the damage to the washers, dryers, and the soap vending machine. Osborn testified that some of the machines were salvageable, but others had to be totally replaced. In addition, he testified that the floor had to be repaired due to damages incurred when moving and replacing the machines. Searls's insurance company paid a total of $33,227.02 for her claim.

*Trial*

During trial, Searls, Osborn, and Miller testified. The State permitted them to use a laser pointer to point out various elements of exhibits to the jury. While the State was cross-examining Ford, the following exchange took place:

Prosecutor: Can the witness be permitted to have a laser pointer?

Trial Court: It's up to security.

Jail: I would prefer not.

No. 46998-7-II

> Trial Court: All Right.
>
> . . .
>
> Prosecutor: Could the witness be permitted to have a pen or pencil to mark the exhibit with?
>
> Trial Court: I would allow him to have a pen, not a pencil.

Report of Proceedings (RP) at 339-40.

The trial court adopted Ford's proposed reasonable doubt jury instruction. The instruction deviated from the standard reasonable doubt instruction in WPIC 4.01 in that it omitted the sentence "The defendant has no burden of proving that a reasonable doubt exists."

In closing argument, Ford emphasized evidence suggesting that the damage he caused was less extensive than what Searls reported to her insurance company. He admitted that he had damaged three dryers and the soap vending machine but contended that Searls – attempting to increase her insurance claim – had caused the remaining damage to the laundromat's washers and dryers. Ford argued that Miller testified to observing damage to only ten machines total and that Miller would have only taken photographs of the damage apparent on the day of the incident.

In rebuttal, the prosecutor stated that sometimes defense strategies can be "smoke and mirrors" and characterized Ford's theory as asking the jury to "[l]ook over here, not over here." RP at 485. Ford objected on the basis that the prosecutor was suggesting that defense counsel deliberately misled the jury. The trial court did not expressly rule on the objection, but stated

4

that "[i]t is argument. It's not evidence, and the Court has no reason to believe that the defense intentionally mislead anyone."[1] RP at 485.

The prosecutor then suggested that if Searls tried to make a fraudulent claim with her insurance company she would put her entire claim at risk and she would be "screwed." RP at 489. Ford did not object to this comment.

The prosecutor also explained the legal standard of proof beyond a reasonable doubt and read the jury instruction stating that legal standard. The prosecutor then stated that "if you believe it in your heart, if you believe it in your mind, if you believe it in your gut, you're convinced beyond a reasonable doubt." RP at 492. Ford did not object to this comment.

The jury found Ford not guilty of first degree robbery and guilty of first degree malicious mischief and the lesser degree offense of second degree robbery.

*Sentencing*

At sentencing, the State provided and defense counsel reviewed certified copies of Ford's prior convictions, which presumably included Ford's 1987 Florida burglary conviction. Based on his prior and present convictions, Ford's offender score was over nine for the second degree robbery conviction and nine for the first degree malicious mischief conviction. Ford did not object to the inclusion of the 1987 Florida burglary conviction in his offender score. The trial court sentenced Ford to serve concurrent sentences of 72 months for second degree robbery and 57 months for first degree malicious mischief.

---

[1] The State characterizes this as the trial court sustaining the instruction and issuing both a curative admonition and curative instruction.

Regarding restitution, the parties agreed that the losses of Searls and her insurance company amounted to $33,727.02. The trial court entered an order setting Ford's restitution at that amount. The trial court also ordered Ford to pay $800 in mandatory LFOs (crime victim penalty assessment, DNA database fee, and criminal filing fee) and a discretionary LFO of $1,000 for court appointed attorney fees and defense costs. The trial court did not address Ford's present or future ability to pay those amounts.

Ford appeals his convictions and the imposition of the discretionary LFO.

ANALYSIS

A. TRIAL COURT MAKING DEFENDANT APPEAR DANGEROUS

Ford argues that the trial court's ruling that he could not use a laser pointer or a pencil after the State's witnesses used the laser pointer created the impression that he was highly dangerous and violated his right to the presumption of innocence. We disagree.

1. Legal Principles

The presumption of innocence is a basic component of a fair trial under our criminal justice system. *State v. Jaime*, 168 Wn.2d 857, 861, 233 P.3d 554 (2010). To preserve the presumption of innocence, the defendant is " 'entitled to the physical indicia of innocence which includes the right of the defendant to be brought before the court with the appearance, dignity, and self-respect of a free and innocent man.' " *Id.* at 861-62 (quoting *State v. Finch*, 137 Wn.2d 792, 844, 975 P.2d 967 (1999)). Measures that single out a defendant as a particularly dangerous person threaten his or her right to a fair trial and are inherently prejudicial because they erode the presumption of innocence. *Jaime¸* 168 Wn.2d at 862.

A trial court has discretion in determining whether security measures are necessary to maintain order and prevent injury in the court. *State v. Hartzog*, 96 Wn.2d 383, 400-01, 635 P.2d 694 (1981). Therefore, we review trial management decisions for an abuse of discretion. *Jaime*¸ 168 Wn.2d at 865. " 'A trial judge must exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury.' " *Id.* at 865 (quoting *Hartzog*, 96 Wn.2d at 400). But we must closely scrutinize whether inherently prejudicial measures are necessary to further an essential state interest, such as preventing injury to those in the courtroom, disorderly conduct, or escape. *Jaime*¸ 168 Wn.2d at 865-66.

Courtroom security measures such as shackling, gagging, or handcuffing can unfairly mark the defendant as guilty or dangerous. *Holbrook v. Flynn*, 475 U.S. 560, 567-68, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986); *Finch*, 137 Wn.2d at 845. Before a trial court may properly impose such inherently prejudicial measures, it must make a factual determination of necessity based on facts in the record. *See Jaime*¸ 168 Wn.2d at 866. Factors the trial court should consider include the seriousness of the charge, the defendant's own safety and that of others in the courtroom, and the adequacy of alternative remedies. *Finch*, 137 Wn.2d at 848. The trial court must balance the need for such measures against the risk of undermining the right of the accused to a fair trial. *See id.* at 849-50.

But when security measures are not inherently prejudicial, the trial court is not required to make a record of a compelling safety or security threat. *See Holbrook*, 475 U.S. at 566-67 (reversing circuit court's conclusion that trial court had to identify safety threats to justify presence of troopers in courtroom). The test is whether the security measure presents an unacceptable risk of impermissible factors coming into play. *Jaime*¸ 168 Wn.2d at 862.

In *Holbrook*, the respondent claimed he was prejudiced by the placement of four uniformed state troopers in the first row of the courtroom's spectator section at his trial. 475 U.S. at 570-71. The Court disagreed, concluding that "we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section" and that "[f]our troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." *Id.* at 571.

2.   Analysis

Here, it is undisputed that the trial court did not address on the record the reasons for disallowing Ford's access to the laser pointer or pencil. Therefore, we must determine whether the trial court's security measure of not permitting Ford to use a laser pointer or a pencil was inherently prejudicial. *Jaime*¸ 168 Wn.2d at 862.

It seems unlikely that the jury would view a laser pointer – an item traditionally utilized in office presentations – as a dangerous item, particularly when utilized in a courtroom setting. It seems much more likely that the jury would assume that a witness was not permitted to use a laser pointer because of more vague security concerns. Moreover, the trial court permitted Ford to use a pen to mark an exhibit. If a juror did in fact wonder whether Ford's inability to use the laser pointer meant that he was dangerous, Ford's ability to use a pen – whose tip and sturdiness would permit it to be used as a weapon – likely would have negated any concerns.

With regard to the pencil, none of the State's witnesses utilized a pencil when testifying. Further, the trial court did not question security officers regarding the use of a pencil and did not express any security reasons for allowing the use of a pen rather than a pencil. Therefore, the

trial court did not separate Ford out from other witnesses by ruling that he could not use the pencil.

We reject Ford's argument that the trial court's ruling that he could not use a laser pointer or a pencil was inherently prejudicial. Therefore, we hold that the trial court was not required to make a determination on the record regarding its rulings. And we hold that the trial court did not abuse its direction in precluding Ford's use of a laser pointer and a pencil.

B.      PROSECUTORIAL MISCONDUCT

Ford argues that three of the prosecutor's comments during closing argument amounted to prosecutorial misconduct. We disagree.

1.      Legal Principles

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011). During closing argument, the prosecutor is given wide latitude to assert reasonable inferences from the evidence. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). To establish prejudice, a defendant must show that the misconduct had a substantial likelihood of affecting the jury's verdict. *State v. Allen*, 182 Wn.2d 364, 375, 341 P.3d 268 (2015).

When the defendant fails to object to the challenged portions of the prosecutor's argument, he or she is deemed to have waived any error unless the prosecutor's misconduct was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice.

*State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012).  The defendant must show that (1)

no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct

resulted in prejudice that had a substantial likelihood of affecting the verdict.  *Id*. at 761.

      2.    Comment on Ford's Theory of the Case

Ford argues that the prosecutor's statements that defense counsel's argument was "smoke

and mirrors" and "look over here, not over here," RP at 485, improperly disparaged and

mischaracterized defense counsel's theory of the case.  We disagree.

      a.    Disparaging Defense Counsel

Ford argues that the prosecutor disparaged defense counsel's theory of the case.  It is

improper for a prosecutor to impugn opposing counsel's role or integrity.  *State v. Lindsay*, 180

Wn.2d 423, 431-32, 326 P.3d 125 (2014).  Prosecutorial statements that malign defense counsel

are impermissible because they can damage a defendant's opportunity to present his or her case.

*Id.* at 432.  But comments that "can fairly be said to focus on the evidence" do not constitute

misconduct.  *Thorgerson*, 172 Wn.2d at 451.

> Here, the prosecutor in rebuttal responded as follows to Ford's closing argument:

> [Defense counsel] said a lot.  I'm not going to even try to respond tit for tat or both for both [sic] of what he did.  I'll suggest a couple of things.  There's a lot of rabbit holes, and sometimes the defense strategy can be – and it can be a legitimate defense strategy.  I'm not complaining about this.  Because the strategies can be you take people down enough rabbit holes, they can get so confused they can't get anywhere.  *Sometimes the strategies can be smoke and mirrors.*  Look over here, not over here because over here is where the evidence lies.  And if you look at that, you might convict the guy, so please look at all these other things over here instead.

RP at 484-85 (emphasis added).  Ford objected to this argument.

These comments are similar to the prosecutor's argument in *Thorgerson*.  In that case, the

prosecutor used the word "bogus" to describe the defense and argued that " '[t]he entire defense

is sl[e]ight of hand.  Look over here, but don't pay attention to there. . . .  Don't pay attention to the evidence. . . .  Look at everything except what matters.' " *Thorgerson*, 172 Wn.2d at 450-51 (quoting court proceedings) (second alteration in original).  The Supreme Court held that referring to defense counsel's presentation as "bogus" and a "sleight of hand" impugned defense counsel's integrity and constituted misconduct.  *Id.* at 451-52.  The court did not comment on whether the "[l]ook over here, but don't pay attention to there" statement was improper.  *Id.* at 452.

The term "smoke and mirrors" the prosecutor used here is similar to the term "sleight of hand" used in *Thorgerson*, and the use of either term is questionable.  However, the tone of the two arguments was completely different.  In *Thorgerson*, the prosecutor directly attacked defense counsel by calling the defense bogus and stating that "the entire defense" was a sleight of hand. *Id.* at 450-51.  Conversely, the prosecutor here stated that Ford's defense could be "a legitimate defense strategy."  RP at 485.  And immediately following the argument quoted above, the prosecutor stated, "I'm not complaining about that.  The defense attorney's job is to do the best job he or she can do for their client.  I think [defense counsel] did as good a job as they could for their client, and good for them."  RP at 485.  The prosecutor continued that defense counsel should test the evidence and should "go everywhere they could possibly legitimately go."  RP at 486.

Ford focuses on the "look over here, not over here" statement.  But the court in *Thorgerson* did not suggest that this portion of the argument constituted misconduct.  And this statement appears to be an attempt – perhaps inartful – to legitimately argue that the defense counsel's theory emphasized collateral or immaterial evidence.

We hold that, considering the prosecutor's statements in the context of the total argument, the prosecutor did not improperly disparage defense counsel's theory of the case.

  b. Mischaracterizing Defense Theory

Ford also argues that the prosecutor mischaracterized his defense theory in order to easily invalidate it. It is improper for a prosecutor to "misrepresent[] defense counsel's argument in rebuttal, effectively creating a straw man easily destroyed in the minds of the jury." *State v. Thierry*, 190 Wn. App. 680, 694, 360 P.3d 940 (2015), *review denied*, 185 Wn.2d 1015 (2016).

Ford apparently claims that the "look over here, not over here" statement misrepresented his defense theory. But Ford never explains how the prosecutor's argument constituted a misrepresentation. Ford did in fact argue that Searls committed insurance fraud by reporting that Ford damaged more machines than he actually damaged. In doing so, he asked the jury to focus on Searls's conduct rather than his own. As noted above, the prosecutor's statement can be regarded as an inartful attempt to argue that Ford was emphasizing collateral or immaterial evidence.

We hold that the prosecutor did not improperly mischaracterize Ford's theory of the case.

  3. Arguing Facts Not in Evidence

Ford argues that the prosecutor committed misconduct by bolstering Searls's credibility during closing argument by referring to facts not in evidence. We hold that even if this argument was improper, Ford waived his misconduct claim because he failed to object to the argument at trial and a curative instruction would have prevented any prejudice.

It is improper for a prosecutor to submit to the jury during closing argument facts not admitted as evidence during the trial. *Glasmann*, 175 Wn.2d at 704-05. It is particularly

improper to bolster a witness's credibility at closing argument with facts not in evidence. *See State v. Jones*, 144 Wn. App. 284, 293-94, 183 P.3d 307 (2008).

Ford argues that the prosecutor committed misconduct by arguing that Searls should be believed because she would have lost a legitimate insurance claim had she fabricated additional damage to the laundromat. The prosecutor argued:

> But if she's going to commit insurance fraud – you think of it this way. Simple woman, simple living, simple business, kind of the low end. Okay, she's got insurance. She's been damaged. She knows that it can be made whole and fixed. *What happens if she screws with that? If she tries to fraudulently do something with the insurance company, what happens? Nothing. Now she's screwed, isn't she?* Is she going to put that at risk? Really? You really think that's what she was up to? I can't tell you she didn't. Maybe nobody can.

RP at 488-89 (emphasis added).

Neither party presented evidence at trial that Searls would lose her entire insurance claim if she tried to defraud her insurance company. Therefore, arguably the prosecutor improperly bolstered her testimony based on facts not in evidence. On the other hand, based on common knowledge regarding insurance claims the prosecutor may have been able to reasonably infer that Searls would lose her entire claim if she engaged in fraud.

We need not decide this issue because, even if the prosecutor's argument was improper, Ford did not object at trial. He therefore waived his claim if a curative instruction would have eliminated any resulting prejudice. *See Emery*, 174 Wn.2d at 760-61. Here, if Ford had objected, the trial court could have struck the prosecutor's arguments from the record and instructed the jury to disregard any arguments that the evidence did not support. This instruction would have cured any prejudice because the prosecutor's statement was not inflammatory or

inherently prejudicial. Therefore, we hold that Ford waived his prosecutorial misconduct claim based on these statements.

        4.    Mischaracterization of Reasonable Doubt

Ford argues that the prosecutor committed misconduct by misstating the State's burden of proof during closing argument. We disagree.

A prosecutor's arguments constitute misconduct if they "shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt." *Lindsay*, 180 Wn.2d at 434. Here, in discussing the reasonable doubt jury instruction, the prosecutor stated:

> [Proof] beyond a reasonable doubt, to a really large extent, we leave it up to you. You have to figure out what convinces you. *What I suggest to you is if you believe it in your heart, if you believe it in your mind, if you believe it in your gut, you're convinced beyond a reasonable doubt.*

RP at 492 (emphasis added).

In *State v. Curtiss*, 161 Wn. App. 673, 250 P.3d 496 (2011), this court rejected the argument that a similar heart and gut comment amounted to misconduct. There, the prosecutor stated during rebuttal closing argument, " 'Consider all the evidence as a whole. Do you know in your gut – do you know in your heart that [the defendant] is guilty as an accomplice to murder? The answer is yes.' " *Id.* at 701 (quoting trial record). The court summarily concluded that "the State's gut and heart rebuttal arguments in this case were arguably overly simplistic but not misconduct." *Id.* at 702. This court cited *Curtiss* in holding that a similar argument did not constitute misconduct in *State v. Fuller*, 169 Wn. App 797, 823, 282 P.3d 126 (2012).

We hold that the prosecutor's heart, mind, and gut comment did not misstate the State's burden of proof and did not constitute misconduct.

5.    Cumulative Error

Ford argues that the cumulative effect of repeated prosecutorial misconduct deprived him

of a fair trial.  We disagree.

Under the cumulative error doctrine, we can reverse a defendant's conviction when the

combined effect of trial errors effectively denies the defendant his or her right to a fair trial, even

if each error alone would be harmless.  *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646

(2006).  Here, the instances of alleged prosecutorial misconduct that Ford challenges were either

proper argument or were waived.  Accordingly, we hold that Ford's claim of cumulative error

fails.  *See id.* (holding that a cumulative error argument failed when defendant failed to establish

prosecutorial misconduct).

C.    FIRST DEGREE MALICIOUS MISCHIEF

Ford argues that the State presented insufficient evidence to demonstrate that he knew

that his actions would cause damage exceeding $5,000, which he claims is an element of first

degree malicious mischief under RCW 9A.48.070(1)(a).  We hold that the plain language of the

first degree malicious mischief statute does not require that the defendant know the monetary

value of the damage and therefore hold that the State presented sufficient evidence of first degree

malicious mischief.

1.    Principles of Statutory Construction

We review the meaning of a statute de novo.  *State v. Wooten*, 178 Wn.2d 890, 895, 312

P.3d 41 (2013).  We employ statutory interpretation to determine and give effect to the

legislature's intent.  *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013).  To determine

legislative intent, we first look to the plain language of the statute considering the text of the

provision in question, the context of the statute, and the statutory scheme as a whole. *Id.* We

consider traditional rules of grammar in discerning the plain language of the statute. *State v.*

*Bunker*, 169 Wn.2d 571, 578, 238 P.3d 487 (2010). We give undefined terms their plain and

ordinary meaning unless a contrary legislative intent is indicated. *State v. Ervin*, 169 Wn.2d 815,

820, 239 P.3d 354 (2010).

    2.    Analysis of RCW 9A.48.070(1)(a)

RCW 9A.48.070(1)(a), the first degree malicious mischief statute, states:

> (1) A person is guilty of malicious mischief in the first degree if he or she *knowingly*
> and maliciously:

> (a) Causes physical damage to the property of another in an amount exceeding five
> thousand dollars.

(Emphasis added.)

Here, the most natural grammatical reading is that the adverb "knowingly" modifies only

the verb or verb phrase that it immediately precedes. *See State v. Killingsworth*, 166 Wn. App

283, 289, 269 P.3d 1064 (2012); *State v. J.M.*, 101 Wn. App. 716, 725, 6 P.3d 607 (2000). The

verb phrase following "knowingly" is "[c]auses physical damage to the property of another."

RCW 9A.48.070(1)(a). "Knowingly" does not naturally modify the prepositional phrase "in an

amount exceeding five thousand dollars," which itself modifies the verb phrase. RCW

9A.48.070(1)(a).

This result is also compelled by the rule of statutory construction that we not construe

statutory language to result in absurd or strained consequences. *State v. Mohamed*, 175 Wn.

App. 45, 52, 301 P.3d 504 (2013). To interpret "knowingly" as modifying the prepositional

phrase following "causes physical damage to property of another" would require that the

defendant know the market value of the property he was damaging or the cost of repair to convict him of malicious mischief. This would be an unreasonable result.

Based on a plain reading of RCW 9A.48.070(1)(a), we hold that a defendant need not know that the monetary value of the physical damage to property exceeds $5,000 to be convicted of first degree malicious mischief.

### 3. Sufficiency of the Evidence

Based on this interpretation of RCW 9A.48.070(1)(a), we hold that the State presented sufficient evidence that Ford knowingly and maliciously caused physical damage to Searls's property in an amount exceeding $5,000.

The test for determining sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). We assume the truth of the State's evidence and draw all reasonable inferences from the evidence in favor of the State. *Id.* at 106. We defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence. *Id.* Circumstantial evidence and direct evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014).

Ford testified that he went into the laundromat to try to get money. Searls testified that she observed Ford attempting to break into one of the dryers with a crowbar over the video feed connected to the laundromat. Searls further testified that Ford attempted to break into 27 or 28 coin boxes of the total 30 washer and dryers as well as the coin box of the soap vending machine. Based on Ford's actions, Searls estimated the total damage to repair the coin boxes, machines,

and any other damage was $25,000. Similarly, Osborn testified that his insurance company paid Searls $33,227 for her claim to compensate for the damage. Although Ford testified that he only damaged four of the laundromat machines, we do not question the jury's resolution of conflicting testimony. *Homan*, 181 Wn.2d at 106.

Viewing this evidence in the light most favorable to the State, we hold that any rational trier of fact could reasonably have found that Ford knowingly caused damage to the machines and that the value of the damage caused exceeded $5,000. Accordingly, we hold that there was sufficient evidence to convict Ford of first degree malicious mischief.

D.      INEFFECTIVE ASSISTANCE OF COUNSEL

Ford argues that his defense counsel provided ineffective assistance of counsel by proposing a reasonable doubt instruction that omitted a statement that he had no burden of proving that no reasonable doubt exists, which relieved the State of its burden of proof. We hold that, although defense counsel's performance was deficient, Ford cannot show prejudice.

1.    Legal Principles

We review claims of ineffective assistance of counsel de novo. *State v. Hamilton*, 179 Wn. App. 870, 879, 320 P.3d 142 (2014). To prevail on an ineffective assistance of counsel claim, the defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011). Representation is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *Id.* at 33. Prejudice exists if there is a reasonable probability that, except for counsel's errors, the result of the trial would have been different. *Id.* at 34.

We begin our analysis with a strong presumption that counsel's performance was reasonable. *Id.* at 33. To rebut this presumption, the defendant must establish the absence of any " '*conceivable* legitimate tactic explaining counsel's performance.' " *Id.* (emphasis added) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). If defense counsel's conduct can be considered to be a legitimate trial strategy or tactic, counsel's performance is not deficient. *Grier*, 171 Wn.2d at 33.

2. Reasonable Doubt Instruction

Ford argues that his trial counsel was deficient by proposing a jury instruction that relieved the State of its burden of proof. Defense counsel proposed the following jury instruction, which was adopted by the trial court:

> The defendant has entered a plea of not guilty. That plea puts in issue every element of the crime charged. The State is the plaintiff and has the burden of proving each element of the crime beyond a reasonable doubt.
>
> A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.
>
> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence. If, after such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

Clerk's Papers at 23, 90.

This proposed instruction was nearly identical to WPIC 4.01. However, WPIC 4.01 also includes another sentence at the end of the first paragraph quoted above: "The defendant has no burden of proving that a reasonable doubt exists." Ford's proposed instruction omitted this sentence.

In *State v. Bennett*, the Supreme Court unambiguously directed trial courts to use *only* WPIC 4.01 when instructing on reasonable doubt. 161 Wn.2d 303, 318, 165 P.3d 1241 (2007); *see also State v. Lundy*, 162 Wn. App. 865, 871, 256 P.3d 466 (2011) (holding trial court erred when it gave a modified form of WPIC 4.01). Because the Supreme Court has informed trial courts and trial counsel that they must use WPIC 4.01, we hold that defense counsel's representation fell below an objective standard of reasonableness when he proposed a reasonable doubt jury instruction that deviated from WPIC 4.01. Accordingly, we hold that Ford's defense counsel was deficient.

The question here is whether the deficient representation prejudiced Ford. Ford argues that the omission of the sentence from WPIC 4.01 left open the possibility that jurors could conclude that Ford had the burden of raising a reasonable doubt. But the instruction unequivocally stated that the State had the burden of proving each element of the crimes beyond a reasonable doubt. And the instruction communicated the fundamental concept that Ford was presumed innocent until proven guilty beyond a reasonable doubt. No reasonable juror would conclude what Ford asserts – that Ford had the burden of proving that a reasonable doubt exists.[2]

In addition, the State did not attempt to capitalize on the omission of the sentence from WPIC 4.01. In closing argument the State did not suggest or even imply that Ford was required to prove a reasonable doubt.

Ford also focuses on the prosecutor's argument during rebuttal that Ford's theory of the case was not believable in light of the evidence. Ford claims that without an instruction stating

---

[2] Significantly, the Supreme Court in *Bennett* affirmed the defendant's conviction even though the trial court's reasonable doubt instruction differed from WPIC 4.01. 161 Wn.2d at 318.

that he had no burden, the jury could have believed it had to convict unless Ford presented more persuasive evidence than the State. However, the jury instructions made clear even without the omitted sentence that it was the State's burden to prove each element of the crimes beyond a reasonable doubt.

There is nothing in the record to suggest that the jury verdict would have been different without the error in the jury instruction. Accordingly, we hold that although Ford's defense counsel was deficient, his ineffective assistance of counsel claim fails because he cannot prove prejudice.

E.    SENTENCING ISSUES

1.    Florida Burglary Conviction

Ford argues that his defense counsel was ineffective by failing to object to the inclusion of his 1987 Florida burglary conviction in his offender score because that conviction was not comparable to a Washington felony offense. We decline to consider this claim because the record is insufficient to determine whether defense counsel's performance was deficient or whether Ford was prejudiced.

An out-of-state conviction can be included in an offender score if the State meets its burden to prove the existence of that conviction and can establish that the out-of-state offense is comparable to a Washington offense. Former RCW 9.94A.525(3); *State v. Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187, *cert. denied*, 135 S. Ct. 287 (2014). For an out-of-state conviction to be comparable to a similar Washington offense, the offenses must be either (1) *legally* comparable – the elements of the out-of-state offense must be substantially similar to the elements of the

21

Washington offense; or (2) *factually* comparable – the out-of-state conviction would have violated the Washington statute. *State v. Thiefault*, 160 Wn.2d 409, 415, 158 P.3d 580 (2007).

Here, Ford's Florida burglary conviction was not legally comparable to the Washington felony offenses of first degree or second degree burglary because in Florida entry into any vehicle could constitute a burglary. Former FLA. STAT. §§ 810.02 (1983), 810.011(3) (1982). In Washington, in 1987 first degree burglary prohibited entry into a "dwelling," former RCW 9A.52.020 (1975), and second degree burglary prohibited entry into a building other than a vehicle. Former RCW 9A.52.030 (1976). Unlawful entry into a vehicle constituted vehicle prowling, a misdemeanor. Former RCW 9A.52.100 (1982).

If Ford was convicted of entering something other than a vehicle, the Florida conviction could be factually comparable to felony burglary in Washington. But nothing in the record provides any detail about the Florida conviction. The conviction could be factually comparable to the Washington offenses, in which case counsel was not deficient in failing to object to inclusion of the conviction in Ford's offender score. Or the Florida conviction could not be factually comparable, in which case counsel was deficient. Similarly, nothing in the record shows whether the trial court would have ruled that the Florida conviction was not comparable if defense counsel had objected.

Because the record is insufficient to determine whether defense counsels' performance was deficient or whether Ford was prejudiced, we decline to consider Ford's ineffective assistance of counsel claim. If Ford wishes to raise these issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

2. Restitution

Ford argues that the trial court erred by imposing $33,727 in restitution because that amount exceeded the trial court's statutory authority.[3]  We disagree.

The trial court's authority to impose restitution is purely statutory.  *State v. Chipman*, 176 Wn. App. 615, 618, 309 P.3d 669 (2013).  We interpret the restitution statute de novo.  *Id.*

RCW 9.94A.753(3)[4] provides:

> [R]estitution ordered by a court pursuant to a criminal conviction shall be based on easily ascertainable damages for injury to or loss of property, actual expenses incurred for treatment for injury to persons, and lost wages resulting from injury. Restitution shall not include reimbursement for damages for mental anguish, pain and suffering, or other intangible losses, but may include the costs of counseling reasonably related to the offense.  The amount of restitution *shall not exceed double the amount of the offender's gain or the victim's loss from the commission of the crime*.

(Emphasis added.)

Ford interprets the statute as authorizing the trial court to order restitution in the amount of double his gain or double the victim's loss, whichever is *less*.  The State argues that the statute authorizes the trial court to order restitution in the amount of double his gain or double the victim's loss, whichever is *more*.

Use of the word "exceed" in RCW 9.94A.753(3) makes it clear that the State's interpretation is correct.  The plain statutory language provides that the trial court has authority

---

[3] Ford did not raise this issue in the trial court.  But the State does not argue that Ford waived this argument because it was raised for the first time on appeal.  We exercise our discretion and consider this issue.

[4] RCW 9.94A.753 has been amended since the events of this case transpired.  However, these amendments do not impact the statutory language relied on by this court.  See LAWS OF 2003, ch. 379, § 16.  Accordingly, we do not include the word "former" before RCW 9.94A.753.

to award restitution as long as the amount does not *exceed* either double the defendant's gain or double the victim's loss. Here, the restitution award was authorized because it did not exceed double the victim's loss. If the legislature had intended the opposite result, it would have inserted the term "the lesser of" – "the amount of restitution shall not exceed *the lesser of* double the amount of the offender's gain or the victim's loss from the commission of the crime." Interpreting the statute in that manner would require this court to add language to the statute.

Further, Ford's interpretation would lead to absurd results. In many crimes, an offender receives little or no financial benefit. It would make no sense to prohibit the trial courts from imposing restitution in those cases.

We hold that the trial court did not exceed its statutory authority in imposing restitution in an amount that did not exceed double Searls's loss.

3. LFOs

Ford argues for the first time on appeal that the trial court erred by imposing a discretionary LFO[5] without making an inquiry into his ability to pay. We exercise our discretion to consider this issue and agree.

a. Failure to Object at Trial

Ford failed to object to the imposition of LFOs in the trial court. We generally do not consider issues raised for the first time on appeal. However, the Supreme Court repeatedly has exercised its discretion under RAP 2.5(a) to consider unpreserved arguments that the trial court

---

[5] Ford does not distinguish between mandatory LFOs and discretionary LFOs. However, he cites only to RCW 10.01.160(3) and *State v. Blazina*, 182 Wn.2d 827, 830, 344 P.3d 680 (2015). Both apply only to discretionary LFOs. Therefore, we limit *Blazina*'s holding to the one discretionary LFO the trial court imposed.

erred in imposing discretionary LFOs without considering the defendant's ability to pay. *E.g.*, *State v. Duncan*, 185 Wn.2d 430, 437, 374 P.3d 83 (2016); *State v. Marks*, 185 Wn.2d 143, 145-46, 368 P.3d 485 (2016); *State v. Leonard*, 184 Wn.2d 505, 506-08, 358 P.3d 1167 (2015); *State v. Blazina*, 182 Wn.2d 827, 830, 344 P.3d 680 (2015).

Here, nothing in the record indicates a possible strategic reason for Ford's failure to object. And there does not appear to be any compelling reason to decline to consider Ford's LFO argument. Therefore, we exercise our discretion and consider the issue.

> b. Failure to Inquire Into Ability to Pay

Before imposing discretionary LFOs, the trial court must make an individualized inquiry into the defendant's present and future ability to pay. Former RCW 10.01.160(3); *Blazina*, 182 Wn.2d at 838. The State argues that the trial court made such an individualized inquiry into Ford's ability to pay here.

At sentencing, Ford's counsel asked the trial court to take into account Ford's indigency in determining his discretionary LFOs. In addition, Ford's trial counsel requested that the trial court keep its award of attorney fees at a bare minimum. The trial court responded to the request by commending defense counsel's civic duty, but stating "the taxpayers deserve to get some reimbursement." RP at 519. However, the trial court did not address Ford's present or future ability to pay. We hold that the trial court failed to make an individualized inquiry into Ford's ability to pay a discretionary LFO.

Accordingly, we remand the issue to the trial court in order to allow for an individualized inquiry into Ford's ability to pay before imposing the discretionary LFO.

No. 46998-7-II

CONCLUSION

We affirm Ford's convictions and sentence, but remand for the trial court to make an individualized inquiry into Ford's present and future ability to pay his discretionary LFO.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

JOHANSON, J.

BJORGEN, C.J.

26